| | | |
|---|---|---|
| LAKENYA BOWDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| v. | ) | |
| | ) | **[Jury Trial Demanded]** |
| XCEL BULK LOGISTICS LLC, and | ) | |
| CHARLES CARROW, Individually | ) | |
| | ) | |
| Defendant. | ) | |

NOW COMES Plaintiff, Lakenya Bowden, by and through undersigned counsel, and complains against Defendants Xcel Bulk Logistics, LLC and Charles Carrow, individually, as follows:

## INTRODUCTION AND NATURE OF THE CASE

Plaintiff brings this action against Defendants for its violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act of 1991, 42 U.S.C. § 1981 for unlawful employment practices based on the protected class of sex (female), including (1) gender discrimination, (2) sexual harassment/hostile work environment, and (3) retaliation. Further, Plaintiff asserts that Defendant Xcel wrongfully discharged her in violation of North Carolina public policy. Plaintiff seeks all available remedies including, but not limited to, compensatory, punitive, and liquidated damages, as well as available equitable relief pursuant to 42 U.S.C. § 2000e-5(f)-(k) and 42 U.S.C. § 1981a, and as otherwise authorized pursuant to law.

## JURISDICTION AND VENUE

1.      This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims for relief asserted herein arise under federal law, and under 28 U.S.C.

1

§ 1343(a)(4), as the claims herein seek relief under acts of Congress providing for the protection of civil rights.

2.     This Court has supplemental jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. § 1367(a).

3.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

4.     Plaintiff Lakenya Bowden ("Plaintiff" or "Ms. Bowden") is a citizen and resident of Hoke County, North Carolina. At all times relevant hereto, Ms. Bowden was employed by Defendant Xcel Bulk Logistics, LLC ("Defendant Xcel" or the "Company") from approximately November 1, 2021 until Defendant terminated her employment on December 9, 2021. At all times relevant hereto, Plaintiff constituted an "employee" pursuant to all applicable statutes.

5.     Defendant Xcel is a foreign corporation organized and existing under the laws of the State of Delaware, with its principal office located at 550 North Liberty Street, Suite 124, Winston-Salem, Forsyth County, North Carolina. Defendant Xcel maintains a registered office at 4030 Wake Forest Road, Suite 349, Raleigh, Wake County, North Carolina. At all times relevant hereto, Defendant Xcel continuously employed at least fifteen (15) employees.

6.     Upon information and belief, Defendant Charles Carrow ("Defendant Carrow" or "Carrow") is a citizen and resident of Scotland County, North Carolina. At all times relevant hereto, Carrow was employed as an Area Manager with Defendant Xcel and was Ms. Bowden's direct supervisor.

2

7.     At all times relevant hereto, Defendant Xcel has continuously constituted an employer engaged in an industry affecting commerce in accordance with sections 701(b), (g), and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g), and (h).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.     Ms. Bowden timely executed and filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 21, 2021, alleging violations of Title VII.

9.     The EEOC issued Ms. Bowden a Notice of Right to Sue on September 9, 2022.

10.     Ms. Bowden complied with all deadlines related to the investigation of her formal administrative complaint.

11.     All conditions precedent to the institution of this lawsuit have been fulfilled.

## FACTUAL ALLEGATIONS

12.     Defendant Xcel is a transportation company focused on pneumatic transportation for industrial and construction dry bulk materials.

13.     Ms. Bowden was hired by Defendant Xcel as a commercial motor vehicle driver on or about November 1, 2021. As a driver, the Company required Ms. Bowden to have a commercial driver's license ("CDL") and she was responsible for driving large commercial trucks (tractor-trailers) to transport dry bulk materials.

14.     When Ms. Bowden was hired by Defendant Xcel, recruiter Corey Duer ("Duer") informed her that drivers were paid based on the number of loads they transported. Therefore, drivers were not paid unless they transported a load. Drivers were not paid hourly, and were not paid simply for being on-site.

3

15.     Duer assured Ms. Bowden she would be assigned at least two (2) loads per day, and Ginny Kasparson ("Kasparson"), one of Defendant Xcel's dispatchers and the Company's Driver Manager, confirmed this information.

16.     At the outset of her employment with Defendant Xcel, Ms. Bowden also informed Duer and Kasparson that she would have a daily, two (2) hour commute (roundtrip) to the location where she was to pick up her trailer. When she began working for the Company, Ms. Bowden also informed her supervisor, Defendant Carrow, about her lengthy commute. As a result, she asked Duer, Kasparson, and Carrow to confirm they would be able to provide Ms. Bowden sufficient notice of her load assignments to enable her to complete the promised minimum of two (2) loads per day. Kasparson and Carrow assured Ms. Bowden that it was the Company's standard procedure to notify drivers of their load assignments the night before they were to be transported, so she would have ample notice to accommodate her commute.

17.     Most drivers employed by Defendant were assigned to work on a specific "account," meaning that driver would transport loads for the same customer(s) throughout their assignment to that account. At all times relevant to this Complaint, Ms. Bowden was the only female employee working on the account to which she was assigned.

18.     In her position as a driver, Ms. Bowden's immediate supervisor was, at all times relevant hereto, Defendant Carrow. In addition to being the only female employee working on her assigned account, Ms. Bowden was the only female employee Carrow supervised.

19.      Prior to being hired, Ms. Bowden had extensive experience driving commercial vehicles and had spent much of her professional career in the commercial transportation field. Ms. Bowden had maintained her CDL for nearly five (5) years when she began working for Defendant Xcel and was very familiar with the rules and regulations surrounding safety and operation of

4

commercial vehicles. Prior to the incidents which are the subject of this action, Ms. Bowden had never been counseled or disciplined for her work performance by any previous employer or by Defendant Xcel.

20.     From the time she was hired, Ms. Bowden's supervisor, Carrow, made inappropriate, sexual comments towards her. For example, Carrow told Ms. Bowden she was "hot" and "pretty" on a regular basis, and his comments became progressively more sexual over time.

21.     On or about November 4, 2021, three (3) days after she began work with the Company, Carrow took Ms. Bowden to lunch, alone, stating that it was a "Company treat." During lunch, Carrow told Ms. Bowden that his wife was having "female problems" that made her not want to have sex with him. He further stated that Ms. Bowden's husband was "lucky" that he had a "hot" wife and he was sure that she "pleased" her husband. Ms. Bowden informed Carrow that his comments were inappropriate and made her uncomfortable. At the end of their meal, Carrow told Ms. Bowden that, after watching her lips during lunch, it was going to be difficult for him to stand up from the table due to his erection.

22.     Over the next two (2) weeks, Carrow continued to make sexual remarks to Ms. Bowden. Carrow made comments including, but not limited to, about Ms. Bowden being "eye candy," that he did not know if he could work with Ms. Bowden every day because of how attractive he found her, making comments about her body, and told Ms. Bowden she was more attractive than a prior female who had worked on her account. Ms. Bowden repeatedly told Carrow that he was making her uncomfortable and to stop making such comments.

23.     Shortly after Carrow's unwelcome comments began, Ms. Bowden notified Defendant Xcel's dispatcher and Driver Manager, Kasparson, that Carrow was making unwelcome, sexual comments to her. Ms. Bowden told Kasparson that she was afraid reporting

5

Carrow's behavior would result in retaliation. In response to Ms. Bowden's complaints, Kasparson told Ms. Bowden that she was sure Carrow was joking, and that the behavior was consistent with his personality. Upon information and belief, Kasparson did not make any attempt to investigate the situation or to tell Carrow to stop making sexual comments to Ms. Bowden.

24.     When Ms. Bowden first reported Carrow's sexual harassment and repeated unwelcome sexual comments to Kasparson, she also requested to be transferred to a different account so that she no longer had to work with Carrow. Kasparson denied her request without giving any reason.

25.     As Ms. Bowden continued to express discomfort to Carrow about the sexual comments he made and she did not respond positively to them, his attitude began to change. Carrow became hostile towards Ms. Bowden. Carrow made comments including, but not limited to, that Ms. Bowden did not "look like a truck driver" and that she could not perform her job as well as the male employees because she was a woman. Carrow would also reassign loads previously assigned to Ms. Bowden to other male drivers for no valid reason. Ms. Bowden reported to Defendant Xcel's Dispatch Center ("Dispatch") Carrow's comments, that he was making her uncomfortable, and that she was losing assigned loads because of him. Ms. Bowden was not informed what, if any, action they planned to take in response to her continued complaints of unwelcome harassment. Upon information and belief, Dispatch instructed Carrow to cease communication with Ms. Bowden about her load assignments, but Carrow remained Ms. Bowden's supervisor. Defendant Xcel took no further action.

26.     After again complaining about Carrow's hostility and harassment, Ms. Bowden's work environment became even more hostile, and the Company, by and through its supervisory and managerial staff, took retaliatory actions against her.

6

27.     On November 12, 2021, Ms. Bowden was dispatched to pick up a load. When she arrived at approximately 5:30 AM, she discovered that another driver had already picked up her load. Neither Carrow nor Dispatch notified Ms. Bowden that the load had been picked up and/or reassigned to a different driver. Ms. Bowden was sent home (commuting nearly two (2) hours round-trip) without pay and was not compensated for traveling to the job site for no reason.

28.     On or about November 17, 2021, Dispatch began routinely taking loads away from Ms. Bowden and assigning them to other drivers. Dispatch would assign loads to Ms. Bowden and then, later in the day, reassign them to other drivers or would notify Ms. Bowden too late in the morning (much less the night before) for her to have adequate time to transport more than one assigned load.

29.     On November 23, 2021, Ms. Bowden contacted Dispatch to ask whether she would be receiving a load assignment that day. Typically, Ms. Bowden was contacted with her load assignments the night before she was scheduled to work. Requesting work assignments was not a part of the load assignment process; however, she began to have to request load assignments or she would not receive any work for the day. When she requested an assignment, the Company assigned a load to her. As a result, thereafter, she had to routinely request loads or she would not have been given any work.

30.     On December 2, 2021, Ms. Bowden again spoke with Kasparson and expressed concerns about having to ask for her assignments, and that Dispatch had begun sending her assignments the day of transport, rather than the night before. She also told Kasparson that Dispatch was notifying her progressively later in the morning each time she was assigned a load. Ms. Bowden reminded Kasparson that her commute was about one (1) hour each way, so the late notice delayed her trips and hindered her ability to complete the two loads per day Duer,

7

Kasparson, and Carrow promised her when she was hired. Kasparson expressed understanding and informed Ms. Bowden she would ensure Dispatch notified her of assigned loads the evening before so that she could plan accordingly and begin her commute early enough to transport her assigned loads.

31.     Throughout this time, contrary to the way in which Ms. Bowden received her assignments, Dispatch continued to notify the male drivers of their load assignments the night before they were scheduled to work, and even provided the male drivers with enough notice that they were able to connect their trailers to their trucks the day before their next scheduled loads.

32.     Nevertheless, the very next day, December 3, 2021, Ms. Bowden again was forced to contact Dispatch to ask whether she would be assigned work that day. At approximately 5:45 AM, Ms. Bowden contacted Dispatch and learned that Defendant Xcel had assigned Ms. Bowden her usual two (2) loads. Though the Company could have notified Ms. Bowden of her load assignments the previous evening, again, Defendant Xcel did not. Ms. Bowden informed Dispatch that she would not be able to complete both of her assigned loads that day due to the Company's delay in notifying Ms. Bowden of the assignments as well as her lengthy commute.

33.     After Ms. Bowden informed Dispatch she would not have enough time to complete both loads, dispatcher Hanna Pricer ("Pricer") informed Ms. Bowden that Kasparson and Bradley Barker ("Barker"), Defendant Xcel's Director of Operations, would be in touch with her to discuss the issue.

34.     At approximately 10:00 AM that same morning, Barker and Kasparson called Ms. Bowden purportedly to discuss her concerns regarding the late notice. During their conversation, Ms. Bowden again explained her concerns about receiving assignments the morning she was to complete them and reiterated that her commute to the facility was lengthy and late notice caused

8

her to lose time within which to complete her assignments. During the call, Barker and Kasparson agreed to improve their communication and notify Ms. Bowden of her assigned loads the night before.

35. Also during the call with Barker and Kasparson, Ms. Bowden reiterated her prior complaints about Carrow sexually harassing her, and again requested to be transferred to a vacant driver position on a different account where she would no longer be supervised by Carrow. Kasparson again denied Ms. Bowden's reassignment request. Ms. Bowden later discovered that Defendant Xcel had hired a male employee to fill the vacant driver position, despite her being more than qualified for the position.

36. On December 7, 2021, after completing her first load of the day, Dispatch instructed a male driver to take Ms. Bowden's trailer to complete a load assigned to him. Ms. Bowden informed Dispatch that the male employee had taken her trailer and no other trailer was available for her use. Dispatch did not assign Ms. Bowden a new trailer or load to complete, so she again was forced to only transport one load that day.

37. On December 8, 2021, Ms. Bowden arrived at work for her scheduled shift. Prior to leaving with her assigned load, Ms. Bowden performed her daily pre-trip inspection, and once she was done with transporting for the day, she performed her daily post-trip inspection. She noted that she observed no damage during either inspection.

38. Nevertheless, later that morning, Carrow contacted Dispatch and wrongfully accused Ms. Bowden of damaging the landing gear during her trip. As indicated above, Ms. Bowden did not damage the landing gear, nor did she find any reportable damage on either her pre-trip or post-trip inspection; therefore, this allegation was false. Carrow never showed any

9

alleged damage to the trailer to Ms. Bowden, nor did he give her an opportunity to observe it and report it herself (if, in fact, any damage actually existed) prior to making his accusation.

39.     Later that day, Ms. Bowden contacted Dispatch and asked for contact information for Defendant Xcel's Human Resources ("HR") Department. Ms. Bowden also asked Carrow for the contact information for the HR Department, and he provided the contact information to her later that day.

40.     Ms. Bowden intended to contact HR to report her Carrow's ongoing sexual harassment of her and his hostile conduct towards her. However, on December 9, 2021, before she had a chance to contact HR, Defendant Xcel summarily fired Ms. Bowden.

41.     Defendant Xcel informed Ms. Bowden she was being terminated for damaging her trailer the day before and failing to report the alleged damage. However, as set forth above, this allegation was false. After Ms. Bowden was accused of damaging the landing gear on her trailer on December 8, 2021, Defendant Xcel never contacted Ms. Bowden to discuss Carrow's accusation or give her an opportunity to refute it. Upon information and belief, Defendant Xcel did not conduct an investigation into the allegation. Instead, Defendant Xcel used Carrow's baseless accusation as an excuse to fire her only one (1) day later.

42.     Upon information and belief, on at least one occasion, one of Defendant Xcel's male employees that Carrow supervised had damaged his landing gear during a trip. The male driver knew of the damage and admitted to causing it. Carrow helped the male driver fix the damage, and the driver did not report the damage in his inspection report. However, pursuant to Company policy, drivers were required to report damage in their inspection report, even if it was fixed. Carrow did not report the male driver for failing to report the damage to his landing gear,

10

and neither the driver nor Carrow were ever disciplined, much less terminated, for failing to report the damage.

43.     Ms. Bowden had never been disciplined or counseled for failing to report damage to a trailer. In fact, most of Defendant Xcel's trailers had damage, but unlike many of the male drivers, Ms. Bowden consistently reported any observed damage prior to her trips, and confirmed that trailers were safe to drive with any reported damage prior to leaving on a trip.

44.     Pursuant to Defendant Xcel's Company policies, the Company provided feedback to new employees to ensure they were meeting the Company's needs. Such feedback could range from casual, informal verbal conversations to formal written performance appraisals. Ms. Bowden never received any sort of feedback during her employment with the Company, nor was she informed of any mistakes she had made or given any opportunities to improve pursuant to feedback prior to Defendant Xcel firing her on December 9, 2021.

45.     As set forth herein, Defendants intentionally discriminated and retaliated against Ms. Bowden in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the Civil Rights Act of 1991, 42 U.S.C. § 1981.

46.     As a direct, proximate, and reasonably foreseeable result of Defendants' unlawful discrimination and retaliation, Ms. Bowden suffered and continues to suffer damages. Defendants are liable to Ms. Bowden for all damages and remedies available to her under the law, including, but not limited to, front pay, back pay, compensatory damages, punitive damages, liquidated damages, costs, and attorneys' fees.

47.     As a further direct, proximate, and reasonably foreseeable result of Defendants' unlawful discrimination and retaliation, Ms. Bowden has suffered and continues to suffer from anxiety, stress, and other mental and emotional damages, for which she is entitled to damages.

11

# FIRST CLAIM FOR RELIEF
## Sexual Harassment/Hostile Work Environment in Violation of
## Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

48.     Plaintiff reiterates and realleges each and every paragraph above and incorporates each as if fully set forth herein.

49.     As set forth above, Ms. Bowden was continuously subjected to unwelcome harassment and hostility due to her sex from Defendants, by and through her supervisor, Defendant Carrow. Ms. Bowden repeatedly told Carrow to stop making the sexual, harassing, and unwelcome comments, but to no avail. In addition, Ms. Bowden repeatedly informed Defendant Xcel's managers and/or supervisors, including, but not limited to, Kasparson and Barker, of Carrow's continuous sexual, harassing, and unwelcome comments but no action was taken to remedy it.

50.     As set forth above, Ms. Bowden was forced to continuously work, without relief, in a hostile work environment as a result of Carrow's severe and pervasive sexual harassment. As discussed above, Carrow repeatedly and continuously harassed Ms. Bowden due to her gender, and Ms. Bowden repeatedly told Carrow to stop making the sexual, harassing, and unwelcome comments, but he simply would not stop. In addition, Ms. Bowden repeatedly informed Defendant's managers and/or supervisors, including, but not limited to, Kasparson and Barker, of Carrow's continuous sexual, harassing, and unwelcome comments but no action was taken to remedy the hostile work environment in which she found herself. In addition, her requests for transfer to another supervisor were summarily denied.

51.     The hostile work environment created and sustained by Defendant Carrow is imputable to the Company for the follow reasons, including but not limited to:

a.      Kasparson and Barker, and possibly others, ignoring her complaints of Carrow's unwelcome sexual remarks and harassment;

b. Failing to initiate an investigation into Ms. Bowden's complaints of sexual harassment by Defendant Carrow;

c. forcing Ms. Bowden to continue working with Defendant Carrow, after she reported his continued harassment and hostility toward her by refusing her request to be moved to a new position;

d. forcing Ms. Bowden to continue to be supervised by Defendant Carrow, even after she reported his continued harassment and hostility toward her;

e. failing and/or refusing to investigate or take remedial action to address Ms. Bowden's complaints of continuous unwelcome sexual remarks and harassment;

f. and in such other ways that may be revealed through the discovery process.

52. The harassment and hostility that Ms. Bowden endured was unwelcome and she took actions to try to stop it – she asked Carrow to stop making sexual comments toward her, and she complained to Defendant Xcel's supervisory and managerial staff numerous times regarding the harassment, as set forth in detail above. Ms. Bowden also requested the contact information for Defendant Xcel's HR department on December 8, 2021, after it became clear that the Company's supervisory and managerial staff were doing nothing to address her concerns.

53. Said unwelcome harassment and hostility was sufficiently severe or pervasive that it altered the conditions of Ms. Bowden's employment and created a subjectively abusive work environment for Ms. Bowden in that 1) she complained to Defendant Xcel's supervisory and managerial staff, including its Driver Manager and Director of Operations, on numerous occasions; 2) she requested to be moved to a different position away from Carrow; and 3) she requested contact information for the Company's HR department to report Carrow's abuse when she realized she had no other choice.

54. The unwelcome harassment and hostility Ms. Bowden endured was objectively sufficiently severe and/or pervasive in that a reasonable person could conclude so based on the frequency of the unwelcome harassment and hostility, its severity, and its humiliating impact upon

Ms. Bowden, as well as its unreasonable interference with her work performance including, but not limited to:

a.     the frequency and severity of Carrow's sexual comments toward her, including comments about her appearance, about how Carrow believed she "pleased" her husband, his comparing her appearance to a prior female employee he supervised, his complaining about his wife not having sex with him, and his telling Ms. Bowden that he had an erection after taking her to lunch alone; and

b.     falsely reporting Ms. Bowden for allegedly damaging company property, an allegation the Company ultimately used as an excuse to fire her..

55.     As a direct, proximate, and reasonably foreseeable result of Defendants' violations of Title VII as described herein, Ms. Bowden has suffered and continues to suffer damages, including but not limited to lost wages, lost benefits, emotional distress, and other non-pecuniary damages.

56.     As a further result of Defendants' acts and omissions as set forth herein, Defendants are liable to Ms. Bowden for all damages and remedies available to her under the law including, but not limited to, front pay, back pay, compensatory damages, punitive damages, costs, attorneys' fees, etc.

## SECOND CLAIM FOR RELIEF
### Retaliation in Violation of Title VII of the Civil
### Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

57.     Plaintiff reiterates and realleges each and every paragraph above and incorporates each as if fully set forth herein.

58.     Ms. Bowden engaged in protected activities under the law when she complained repeatedly of Carrow's continuous unwanted, unwelcome, and nonconsensual sexual harassment.

59.     Ms. Bowden complained about the sexual harassment, discrimination, and hostility she endured, as described herein, to members of Defendant Xcel's supervisory and managerial staff on numerous occasions during her approximately six (6) weeks of employment with the

14

Company. Ms. Bowden's internal complaints of sexual harassment, discrimination, and hostility constitute protected activities under federal law.

60.     Within a matter of days after she began complaining of the harassment, discrimination, and hostility, Defendant Xcel took adverse actions against Ms. Bowden including, but not limited to:

   a.     taking away assigned trips;

   b.     failing to notify her of assigned trips thereby requiring her to contact the Dispatch Center to request trips;

   c.     using a single, unsubstantiated accusation of failure to report damage to company equipment[1], reported solely by her harasser, less than one (1) day after she requested contact information for the Company's HR department; and

   d.     such other ways that may be revealed through the discovery process.

61.     Defendants retaliated against Ms. Bowden because she complained about the sexual harassment, discrimination, hostility and hostile work environment she endured.

62.     As a direct, proximate, and reasonably foreseeable result of Defendants' retaliation as described herein, Ms. Bowden has suffered and continues to suffer damages, including but not limited to lost wages, lost benefits, emotional distress, and other non-pecuniary damages.

63.     As a further result of Defendants' acts and omissions as set forth herein, Defendants are liable to Ms. Bowden for all damages and remedies available to her under the law including, but not limited to, front pay, back pay, compensatory damages, punitive damages, costs, attorneys' fees, etc.

---

[1] Importantly, Defendant knew that the accuser, Defendant Carrow, had been harassing Ms. Bowden from nearly the beginning of her employment (and had failed to take any remedial action as set forth above). Nevertheless, Defendant Xcel used Carrow's accusation as an excuse to fire Ms. Bowden without 1) proper investigation of the allegation; 2) affording Ms. Bowden the ability to refute the allegations; 3) any prior counseling or discipline for such behavior; and 4) any opportunity to rectify the situation or avoid similar behavior in the future. Upon information and belief, on at least one occasion, the Company did not fire another employee who had actually caused, and failed to report, damage to his trailer.

15

**Gender Discrimination in Violation of Title VII of**
**the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights**
**Act of 1991, 42 U.S.C. § 1981**

64. Plaintiff reiterates and realleges each and every paragraph above and incorporates each as if fully set forth herein.

65. As a female, Ms. Bowden is a member of the protected class of gender.

66. Ms. Bowen was subjected to the adverse employment action of termination when the Company used a single accusation of error, reported by her harasser only, as an excuse to fire her.

67. In addition, the Company treated similarly situated male coworkers more advantageously than Ms. Bowden. Defendant Xcel repeatedly removed loads assigned to Ms. Bowden and reassigned them to her male coworkers. In addition, the Company through its agents and/or employees delayed notifying Ms. Bowden of her load assignments even when the Company knew or should have known such delay would impact her deliveries, and thus her pay, for the day. Upon information and belief, Defendant Xcel did not treat similarly situated male employees in the same manner. On at least one occasion, Defendant reassigned Ms. Bowden's trailer to another male driver (and provided no reason for doing so), leaving her without a trailer to complete a second load that day but enabling the male driver to complete additional loads, and thus, earn more pay.

68. The Company treated Ms. Bowen differently than similarly situated employees outside her protected class of gender when the Company fired her after her harasser, Carrow, accused her of damaging the trailer she utilized on December 8, 2021. Ms. Bowden did not damage her trailer during her use on that day; however, other male employees had damaged their trailers during load transport previously, and had not reported the damage, but the Company neither

16

terminated nor disciplined those male employees for their causing and/or failing to report such damage.

69. Ms. Bowden has suffered damages as the result of the acts of the Company through its agents and/or employees, including, but not limited to lost income, and such damages were a direct, proximate, and reasonably foreseeable outcome of the Company's discriminatory acts.

70. Defendants engaged in unlawful employment practices in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1) and 42 U.S.C. § 1981. Specifically, Defendant subjected Ms. Bowden to discrimination based on her gender. The gender discrimination was perpetuated by Defendant Xcel's managerial and/or supervisory staff including, but not limited to Kasparson and Barker, who had actual knowledge of the discrimination and neither reported it nor took action to stop it.

71. The effect of the practices complained of hereinabove was to deprive Ms. Bowden of equal employment because of her gender.

72. As set forth *supra*, Defendant Xcel treated its similarly situated male employees more advantageously than Ms. Bowden due to her gender.

73. As a direct, proximate, and reasonably foreseeable result of Defendants' violations of Title VII, 42 U.S.C. § 2000e-2(a)(1) and 42 U.S.C. § 1981 as described herein, Ms. Bowden has suffered, and continues to suffer damages, including lost wages, lost benefits, emotional distress, and other non-pecuniary damages.

74. As a further result of Defendants' acts and/or omissions as set forth herein, Defendant is liable to Ms. Bowden for all damages and remedies available to her under the law including, but not limited to, front pay, back pay, compensatory damages, punitive damages, costs, attorneys' fees, etc.

17

## FOURTH CLAIM FOR RELIEF
### Wrongful Discharge in Violation of
### North Carolina Public Policy

75.     Plaintiff reiterates and realleges each and every paragraph above and incorporates each as if fully set forth herein.

76.     As set forth herein, Defendant Xcel unlawfully discriminated against Ms. Bowden because of her gender by subjecting her to and failing to rectify sexual harassment, taking away work she had been assigned in favor of assigning more work to male employees, disciplining her for alleged behaviors for which her male counterparts were not disciplined, and ultimately terminating her in contravention of the Company's own policies, whereas other male employees were not terminated for violations similar to the violation Ms. Bowden was accused of committing.

77.     Additionally, Defendants' acts, as described hereinabove, contravene and violate the public policy of the State of North Carolina as set forth in North Carolina's Equal Employment Practices Act ("EEPA"). The EEPA declares that it is the policy of this State to "protect and safeguard the right and opportunity of all persons to seek, obtain, and *hold employment* without discrimination or abridgement on account of…*sex*…." *See* N.C. Gen. Stat. § 143-422.2 (emphasis added).

78.     As set forth above in Paragraphs 12-47, *supra*, Defendants engaged in unlawful employment practices in violation of North Carolina law. Specifically, Defendant Xcel, through its supervisory and managerial staff, discriminated against Ms. Bowden by taking away assigned trips in favor of assigning additional work to male employees, subjecting her to and failing to remedy sexual harassment to which male employees were not subjected, and subsequently terminating her in retaliation for complaining about the ongoing harassment, discrimination, and hostility, thereby denying her the opportunity to "hold employment without discrimination…on

18

account of sex…" in violation of North Carolina public policy as codified in N.C. Gen. Stat. § 143-422.2. The failure to address Ms. Bowden's concerns of sexual harassment, discrimination, and hostility, and Defendant Xcel's subsequent retaliatory termination of Plaintiff's employment, therefore, constitutes wrongful discharge under North Carolina law.

79.     Ms. Bowden's sex, as well as her complaints about sexual harassment, discrimination, and hostility from her supervisor and other members of Defendant Xcel's supervisory and managerial staff, as described herein, were a substantial factor in Defendant's Xcel's decision to terminate Plaintiff's employment.

80.     Defendants' actions, as described hereinabove, violated the EEPA, among other statutes, and offended North Carolina's public policy of permitting employees to hold employment without discrimination on account of sex. Ms. Bowden was wrongfully terminated in violation of public policy because she opposed and complained about the ongoing sexual harassment, discrimination, and hostility to which she was subjected. Therefore, Ms. Bowden is entitled to compensation for lost wages, lost benefits, front pay, back pay, economic losses, and any other applicable damages pursuant to North Carolina law.

## JURY DEMAND

Plaintiff demands a trial by jury of the claims asserted in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays the Court for judgment against Defendants to the full extent permitted by 29 U.S.C. § 794a(a)(1), 42 U.S.C. § 2000e-5(f)-(k), and 42 U.S.C. § 1981a, including but not limited to the following:

19

1.        Judgment in Plaintiff's favor, determining that Defendants' actions and conduct towards and relating to Plaintiff violated Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, and North Carolina public policy;

2.        Award Plaintiff all monetary damages incurred;

3.        Award Plaintiff damages for mental anguish, emotional distress, pain and suffering, and other non-pecuniary damages;

4.        Award Plaintiff the costs, disbursements, expenses, reasonable attorneys' fees, and expert witness fees incurred by Plaintiff in filing and prosecuting this action pursuant to 42 U.S.C. § 1981a and as may be authorized by any other applicable state or federal laws;

5.        Award Plaintiff pre- and post-judgment interest on all damages; and

6.        For all other, further relief as this Court deems just and appropriate.

This the 8th day of December, 2022.

**GREEN MISTRETTA LAW, PLLC**

/s/ Dawn T. Mistretta

Dawn T. Mistretta, N.C. State Bar No. 31691
Lindsey A. Bullard, N.C. State Bar No. 46664
1752 Heritage Center Drive, Suite 101
Wake Forest, North Carolina 27587
Telephone: (919) 278-7453
Fax: (855) 876-8893
dmistretta@gmlawyers.org
lbullard@gmlawyers.org
*Counsel for Plaintiff*

20